UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

DIPENDRA TIWARI, et al.                                           PLAINTIFFS


v.                                    CIVIL ACTION NO. 3:19-CV-884-JRW-CHL


ERIC FRIEDLANDER, et al.                                        DEFENDANTS

and

KENTUCKY HOSPITAL ASSOCIATION              INTERVENING DEFENDANT

## ORDER

1.      The Court **GRANTS in part** and **DENIES in part** the motion to dismiss filed by
Eric Friedlander and Adam Mather, in their official capacities at the Kentucky Cabinet for Health
and Family Services ("Kentucky") (DN 18).

2.      The Court **GRANTS in part** and **DENIES in part** the motion to dismiss filed by
the Intervening Defendant Kentucky Hospital Association (DN 42).

3.      Under the *Slaughter-House Cases*, 83 U.S. 36 (1873), the Court **DISMISSES**
Count III of the Amended Complaint **with prejudice**.

4.      There is no question about Plaintiff Grace Home Care's standing.  But the Court
**ORDERS** Plaintiffs Dipendra Tiwari and Kishor Sapkota to show cause for why they have
standing as individuals to pursue the remaining claims.  Their deadline for filing a notice
dismissing those claims or a brief addressing the individuals' standing is **September 10**.
Responses and replies, if any, are due in accordance with the Local Rules.

## **MEMORANDUM OPINION**

Plaintiffs Dipendra Tiwari and Kishor Sapkota are immigrant entrepreneurs.  They started a home health company called Grace Home Care to serve Nepali-speaking patients.  But competitors convinced Kentucky to block them from doing business, denying them a "Certificate of Need."

Under Kentucky's Certificate of Need laws, some health care companies must get permission from the government before they do business.  If Kentucky decides the new services aren't needed, the new health care business can't open.  Kentucky can deny a Certificate of Need even if the new health care company will reduce patients' costs or deliver higher quality care than Kentuckians can currently access.

Under this system, the government – not doctors, not patients – decides if a community has enough hospitals.  And enough hospital beds.  And enough rehab centers.  And enough mental health facilities.  And enough nursing homes.  And enough hospices.  And enough outpatient surgery centers.  And enough drug treatment.  And, here, enough home health care businesses.

It's hard to picture this kind of central planning in most other American industries.  Consider, for example, if Michigan had told Henry Ford he couldn't build a Model T factory because the market had enough Buicks.  Just think how different our Commonwealth would look if Kentucky had told the innovators behind Louisville Slugger, Churchill Downs, and Kentucky Fried Chicken we already had enough baseball bats, race tracks, and fast food.  And imagine if a Certificate of Need system had said:

- no need for Stanford (1891) because of Santa Clara (1851); [1]

---

[1] A HISTORY OF STANFORD, https://www.stanford.edu/about/history/; HISTORY – ABOUT SCU, https://www.scu.edu/aboutscu/history/.

- no need for MGM (1924) because of Universal Pictures (1912);[2]

- no need for Disneyland (1955) because of Knott's Berry Farm (1941);[3]

- no need for Barbie (1959) because of Raggedy Ann (1915);[4]

- no need for Netflix (1997) because of Blockbuster (1985);[5]

- no need for Google (1998) because of Yahoo (1994);[6]

- no need for iPhones (2007) because of Blackberries (1999);[7] and

- no need for Zoom (2012) because of Skype (2003).[8]

---

[2] MGM HISTORY, https://www.mgm.com/corporate/history; UNIVERSAL, ABOUT: HISTORY, https://www.universalpictures.com/about#:~:text=Universal%20Studios%20is%20a%20member,Cochran e%2C%20and%20Jules%20Brulatour.

[3] Walt Disney: Reinventing the American Amusement Park, AMERICAN EXPERIENCE, https://www.pbs.org/wgbh/americanexperience/features/reinventing-american-amusement-park/; The History of Knott's Berry Farm, KNOTT'S BERRY FARM, https://www.knotts.com/blog/2020/april/the-history-of-knotts-berry-farm. It's hard to pinpoint an exact date for the founding of Knott's Berry Farm's amusement park. The family behind it moved to California to open the berry farm in 1920 and opened the berry market in 1927. Its services gradually expanded. Ghost Town was built in 1941. Guests could walk around for free and only had to pay if they wanted to ride something or buy something, much like a state fair. It began charging admission in 1968. *Id.*

   Of course, for every Disneyland, there's a Dickens World, a now-defunct English theme park where visitors could breathe soot, smell rotten cabbage, get scolded by an angry schoolteacher, and slide down a simulation of a sewer. SAM ANDERSON, *The Pippiest Place on Earth*, N.Y. TIMES, Feb. 12, 2012, at MM48. The free market promises only a shot at success, not a guarantee.

[4] THE BARBIE STORY: BARBIE WAS CREATED BY RUTH HANDLER—INVENTOR, WIFE, MOTHER. https://barbie.mattel.com/en-us/about/our-history.html; U.S. Patent No. 47,789 (filed May 28, 1915).

[5] ASHLEY RODRIGUEZ, *Netflix was Founded 20 Years Ago Today Because Reed Hastings Was Late Returning a Video*, QUARTZ, https://qz.com/1062888/netflix-was-founded-20-years-ago-today-because-reed-hastings-was-late-a-returning-video/; FRANK OLITO, *The Rise and Fall of Blockbuster*, BUSINESS INSIDER, https://www.businessinsider.com/rise-and-fall-of-blockbuster#david-cook-opened-the-first-blockbuster-in-1985-1.

[6] *From the Garage to the Googleplex*, https://about.google/intl/en_us/our-story/; DAN TYNAN, *The History of Yahoo, and How It Went from Phenom to Has-Been*, FAST COMPANY, https://www.fastcompany.com/40544277/the-glory-that-was-yahoo.

[7] THIS DAY IN HISTORY, JANUARY 9, 2007: STEVE JOBS DEBUTS THE IPHONE, https://www.history.com/this-day-in-history/steve-jobs-debuts-the-iphone; ALEXANDRA APPOLONIA, *How Blackberry Went From Controlling the Smartphone Market to a Phone of the Past*, BUSINESS INSIDER, https://www.businessinsider.com/blackberry-smartphone-rise-fall-mobile-failure-innovate-2019-11.

[8] YITZI WEINER, *The Inspiring Backstory of Eric S. Yuan, Founder and CEO of Zoom*, MEDIUM, https://medium.com/thrive-global/the-inspiring-backstory-of-eric-s-yuan-founder-and-ceo-of-zoom-98b7fab8cacc; ALEX KONRAD, *Zoom, Zoom, Zoom! The Exclusive Inside Story of the New Billionaire Behind Tech's Hottest IPO*, FORBES, https://www.forbes.com/sites/alexkonrad/2019/04/19/zoom-zoom-zoom-the-exclusive-inside-story-of-the-new-billionaire-behind-techs-hottest-ipo/#3b32c3ec4af1; DOUG

As important as innovation-through-competition has been to those industries, it's arguably even more important in health care, where the stakes are life and death.[9]  Sure, health care differs from other industries in important ways.  But Plaintiffs argue that the health care industry's unique qualities do not mean that requiring a Certificate of Need for a home health company serves a legitimate state interest.

On Plaintiffs' side are four decades of academic and government studies saying Certificate of Need laws accomplish nothing more than protecting monopolies held by incumbent companies.  They also say these laws *worsen* the problems of cost, access, and quality of care that the laws are supposed to help fix.

If requiring a Certificate of Need for a home health company worsens all problems it purports to fix, the law is irrational.  And if it's irrational, it's unconstitutional.  At this point, Plaintiffs have plausibly alleged that it is.

## I.

## A.

If you've ever been close to an elderly relative who couldn't take care of herself, your loved one may have depended on the talent and dedication of a home health worker.[10]

Take, for example, an aging parent with early-onset dementia.  Perhaps she's lived alone since her spouse died a decade ago.  She doesn't want to impose on her kids and grandkids.  And as

---

AAMOTH, *Smartphones:   A   Brief   History   of   Skype*, TIME   MAGAZINE, https://techland.time.com/2011/05/10/a-brief-history-of-skype/.

[9] *Cf.* U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *Fact Sheet: Explaining Operation Warp Speed*, https://www.hhs.gov/about/news/2020/06/16/fact-sheet-explaining-operation-warp-speed.html.

[10] The Court takes the facts from the Amended Complaint and draws all reasonable inferences in Plaintiffs' favor.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court also considers the State Health Plan and Deloitte Report because both are central to Plaintiffs' claims. *See* DN 15 ¶¶ 63, 67, 76-78, 82, 88-91, 99, 120-1.  At oral argument, Plaintiffs made clear that they don't object to considering the Deloitte Report, which the Kentucky Hospital Association attached to its reply.

willing as those kids and grandkids may be, they might not be able to provide the full-time care she requires.[11]  She also doesn't want, and may not yet need, to move into a nursing home.  But living alone twenty-four hours a day isn't an option because she can no longer keep her medicine straight, cook safely, or bathe without assistance.

For many seniors in that situation, home health care is their "first choice."[12]  In-home aides help patients with "personal care and basic household tasks," take them to the doctor, and sometimes provide medication and physical therapy.[13]  It is cheaper than a nursing home,[14] and patients "often have better outcomes."[15]

Of course, seniors aren't the only ones who hire home health aides.  But seniors use them the most.[16]  And as you can imagine, not every combination of patient and aide is the right match.  In the home health context, the quarters are close, and personalities matter.  Often, tranquility depends on a compassionate home health aide with the right mix of patience and communication skills.[17]

B.

In Kentucky, the government, not the market, decides whether there's a need for more home health services.  That's because home health companies are among the health care providers

---

[11] *See id.* ¶ 40 (Tiwari and Sapkota are "personally aware of Nepali-speaking individuals who cannot find adequate home health services from Nepali-speakers and who would have better health outcomes and would be less of a burden to their families if Grace Home Care were able to operate.").

[12] *Id.* ¶ 32.

[13] *Id.* ¶ 26; *see also* DN 48-2 at #461.

[14] DN 15 ¶ 30.

[15] DN 15 ¶ 33.

[16] *Id.* ¶ 28; *see also id.* ¶ 31 ("Home health care is vital for many patients who need extended or long-term care."); *and* DN 48-2 at #459-60 ("In this context, Home Health Agencies provide critically important services for long-term care at home.").

[17] *See* DN 15 ¶ 38 ("The inability of a patient to communicate with a home health aide presents health and safety risks.").

that cannot serve patients until they obtain a Certificate of Need,[18] which says the company will

serve an unmet need in a particular county.[19]

In deciding whether to grant a Certificate of Need to a home health company, Kentucky's

Cabinet for Health and Family Services ("Kentucky") applies a complicated formula using target

rates, age cohorts, and county populations.[20]  The formula determines a county's "need" for more

home health services.[21]  Then, Kentucky applies the following rules:

1) A new home health business may open if the government says at least 250 additional patients in the county need home health.[22]

2) An existing home health business may expand if the government says at least 125 additional patients in the county need home health.[23]

3) Existing hospitals may open a home health business if the government says at least 50 additional patients in the county need home health.[24]

Thus, "the need requirement is applied unequally depending on who the applicant is."[25]

That's not so bad if you want to start a home health company in Boone, Campbell, Daviess,

Fayette, McCracken, or Oldham counties.[26]  Kentucky's formula says those 6 counties have at

least 250 untreated patients in need.  But Kentucky has 114 other counties.  And the doors to those

114 counties are closed to start-up home health businesses, even though a report commissioned by

---

[18] *Id.* ¶¶ 2, 73.
[19] Ky. Rev. Stat. § 216B.015(9); DN 15 ¶ 2.  The parties generally agree about how Kentucky's Certificate of Need program operates.  DN 31 at #233 n.1; DN 46 at #336 n.1.  The defendants didn't challenge Plaintiffs' assertion in their replies.  *See* DNs 45 & 48.
[20] *See* DN 42 at #312.
[21] *See id.*
[22] *Id.*; DN 15 ¶ 80.
[23] DN 42 at #312-13; DN 15 ¶ 84.
[24] DN 42 at #312; DN 15 ¶ 85.
[25] *Id.* ¶ 83.
[26] DN 42 at #315-17; DN 15 ¶ 82.

Kentucky and submitted here by the Intervening Defendants shows an unmet need for home health services across the Commonwealth.[27]

C.

It's an understatement to say Kentucky's Certificate of Need laws favor incumbents.[28] Since 2000, in the home health context, Kentucky granted approximately 50 Certificates of Need when incumbents applied for the them.[29]  But when a start-up files an application contested by an incumbent,[30] Kentucky either "always or almost always" rejects the start-up's application "on the basis that a lack of need existed."[31]  According to Plaintiffs, "it is impossible for a new health agency to open in most counties in Kentucky because existing home health agencies and hospitals prevent the need determination for home health services from ever reaching the 250-person threshold."[32]

In other words, the deck is stacked against start-ups because of incumbents' successful "rent-seeking," with the "rents" referring to monopoly profits.  Rent-seeking businesses make a sort-of "extralegal" contract with politicians: money and votes for the politicians, regulations that ensure a monopoly for the interest group.[33]  Meanwhile, consumers lose out.  Without the market competition that normally regulates businesses' behavior, the monopoly can charge otherwise unsustainably high prices for otherwise unsustainably mediocre products.

---

[27] DN 48-2 at #461 (map showing unmet need in many counties); *see also id.* at #451 ("Expanded use of home health services might require expanding the number of agencies to fill unmet demand in several counties."); *id.* at #460 ("Interestingly, counties that do not have a Home Health Agency based within the county itself appear to have lower utilization.  This could be an indicator of potential unmet need. Conversely, [c]ounties in vicinity of a large Home Health Agency appear to use home health services more readily."); DN 15 ¶ 29 ("There is unmet need for home health services throughout Kentucky.").

[28] *See* DN 15 ¶ 165; *see also id.* ¶ 97.

[29] *Id.* ¶ 124.

[30] *Id.* ¶¶ 103-5.

[31] *Id.* ¶¶ 112, 123 (cleaned up).

[32] *Id.* ¶ 125.

[33] Fred S. McChesney, Money for Nothing: Politicians, Rent Extraction, and Political Extortion 21 (1997).

Plaintiffs don't argue that the politicians who created Kentucky's Certificate of Need regime *intended* to harm patients.  Certificate of Need laws were originally "based on the premise that restricting the supply of health care would somehow lead to greater control over health care costs."[34]  Congress mandated these laws, and 49 states followed suit.[35]  But as a general matter, imposing an artificial shortage on a service simply causes its price to rise.  So, predictably, Certificate of Need laws were "not successful in containing health care costs."[36]

In response, in 1986, Congress repealed its mandate for states to create Certificate of Need regimes.[37]  "In the wake of the federal repeal, a number of states followed suit and repealed their own [Certificate of Need] laws.  Unsurprisingly, subsequent studies did not show a massive explosion in health care costs."[38]

In 2013, Kentucky asked the consulting firm Deloitte to study its health care capacity.[39]  It recommended that Kentucky consider suspending or discontinuing the home health Certificate of Need requirement.[40]  Had Kentucky done so, it would have joined the majority of states, which

---

[34] DN 15 ¶ 44.

[35] *Id.* ¶ 53.

[36] *Id.* ¶ 58; *see also id.* ¶ 45 (limiting hospital beds "only insulated existing hospitals from new competition").

[37] *Id.* ¶ 55; *see also id.* ("Congress determined that certificate-of-need programs produced detrimental effects . . . .").  "At least twice since 1986, the federal government has reaffirmed its conclusion that certificate-of-need programs raise costs and harm patients."  *Id.* ¶ 56; *see also id.* ¶¶ 57-58.

[38] MAUREEN OHLHAUSEN, *Certificate of Need Laws: A Prescription for Higher Costs*, ANTITRUST MAGAZINE 50, 52 (Dec. 21, 2015).

[39] DN 15 ¶ 63.

[40] DN 48-2 at #389 ("Strengthen home health and other community based services; Consider suspending [Certificate of Need] for home health"); *id.* at #466 ("Encourage expansion of home health agencies into areas that have already been identified by the Cabinet as being underserved, or consider suspending / discontinuing the [Certificate of Need] program for Home Health Agencies."); *id.* at #388 ("*Next step for consideration*: Strengthen home health and other community based services to facilitate transition and reduce readmissions to facility-based care (e.g. through expansion of [Home and Community Based Services] waiver programs or suspension / discontinuation of [Certificate of Need] for home health agencies").

don't subject home health services to a Certificate of Need regime.[41]  And it would have moved in the direction of states that have eliminated Certificate of Need laws altogether.[42]

### D.

Plaintiffs Dipendra Tiwari and Kishor Sapkota are Nepali immigrants who speak Nepali.[43] Tiwari is a certified public accountant who previously worked for a different home health company.[44]  Sapkota is a home health aide.[45]  As Louisvillians in a city where the Nepali-speaking immigrant and refugee community "numbers in the thousands,"[46] Tiwari and Sapkota know Nepali-speaking people who can't find home health aides who speak their native language.[47]  So in 2017, they started Grace Home Care to fulfill "their dream of opening a home health agency that would serve the Nepali-speaking community in Kentucky."[48]

As is obvious to anyone who has depended on good communication with a home health aide, or whose loved one has depended on it — or who has ever traveled to a foreign country without knowing the local language[49] — patients "have better health outcomes" if they can hire home health aides who speak their language.[50]  So it's no surprise that many Nepali-speaking patients may forgo home health care completely if they can't get a Nepali-speaking home health aide,[51] a problem that will only worsen as the community ages.[52]

---

[41] DN 15 ¶ 34.
[42] *Id.* ¶ 61.
[43] *Id.* ¶ 21.
[44] *Id.* ¶ 22.
[45] *Id.* ¶ 23.
[46] *Id.* ¶ 35.  This opinion uses Louisville and Jefferson County synonymously.  In 2003, the city and the county merged.
[47] *Id.* ¶¶ 40, 89, 163.
[48] *Id.* ¶ 41.
[49] *Cf. Lost in Translation* (Focus Features 2003).
[50] DN 15 ¶ 40.
[51] *Id.* ¶ 39.
[52] *Id.* ¶ 36.  Translator services are a "useless" substitute because many Nepali speakers don't understand translators' formal language.  *Id.*

In this light, you might think the "need" for Grace Home Care would be clear.  But when Grace Home Care applied for a Certificate of Need to do business in Louisville,[53] an incumbent home health provider, Baptist Healthcare, opposed the application.[54]   And so Kentucky denied Grace Home Care's application for a Certificate of Need,[55] as it does nearly every time an incumbent opposes a start-up provider's application.[56]

Kentucky reasoned that the State Health Plan's formula projected a demand for fewer home health aides than Louisville's supply.[57]   But the State Health Plan doesn't consider the "unique needs of the Nepali-speaking community."[58]   So long as existing home health companies or hospitals ensure that Louisville's formula-defined need never exceeds 250 patients, Plaintiffs will "never" qualify for a Certificate of Need.[59]   Kentucky's Certificate of Need law is thus "a nearly insurmountable barrier to opening a new home health agency,"[60] harming "both entrepreneurs and patients."[61]

According to Plaintiffs, this regime violates their constitutional rights.[62]

---

[53] *Id.* ¶ 116.

[54] *Id.* ¶ 119.

[55] *Id.* ¶ 120.

[56] *Id.* ¶¶ 112, 123, 124.

[57] *Id.* ¶ 120 ("the state health plan in effect at the time projected a need of negative 929 home health patients").

[58] *Id.* ¶ 121.

[59] *Id.* ¶ 169.

[60] *Id.* ¶ 161.

[61] *Id.* ¶ 98.  Kentucky's Certificate of Need requirements are separate from its licensing requirements.  *Id.* ¶ 24.  Plaintiffs don't challenge Kentucky's licensing system for home health agencies and are prepared to comply with Kentucky's licensing requirements and other laws. *Id.* ¶¶ 25, 129-60, 171, 173-6.  But they can't get a license without a Certificate of Need. *Id.* ¶ 172.

[62] U.S. CONST. AM. XIV § 1; DN 15 ¶¶ 179-214; *see Washington v. Glucksberg*, 521 U.S. 702 (1997) (test for substantive due process); *Allegheny Pittsburgh Coal Co. v. County Commission*, 488 U.S. 336 (1989) (test for equal protection).

II.

Rational-basis scrutiny governs Plaintiffs' Equal Protection and Due Process claims.[63] Under rational-basis review, when the government regulates the economy — here, the health care market — it receives great deference.  Kentucky doesn't need to demonstrate "mathematical precision in the fit between justification and means."[64]  Rather, binding precedents require this Court to presume an economic regulation is constitutional, and Plaintiffs must "show that there is no rational connection between the enactment and a legitimate government interest."[65]  Even if the government relies only on speculation "unsupported by evidence or empirical data," the plaintiff must disprove all conceivable reasons for the law.[66]

It's a high bar.  But it's not a rubber stamp.  Between 1970 to 2000, applying rational-basis review, the Supreme Court struck down at least a dozen economic laws as violating either the Equal Protection Clause or the Due Process Clause.[67]

---

[63] As Plaintiffs concede, *Slaughter-House* bars their Privileges-or-Immunities Clause claim, which they brought solely to preserve for appeal.  DN 15 ¶ 214; *see Slaughter-House Cases*, 83 U.S. 36, 80 (1872).  Dismissing that claim is appropriate.

[64] *See Eastern Enterprises v. Apfel*, 524 U.S. 498, 550 (1998) (Kennedy, J., concurring in the judgment and dissenting in part) (cleaned up).

[65] *American Express Travel Related Services Co. v. Kentucky*, 641 F.3d 685, 689 (6th Cir. 2011) (cleaned up).  In *American Express*, the Sixth Circuit reversed the district court's order declaring a law unconstitutional on due process grounds.  *Id.* at 686.  However, the district court's order came after cross motions for summary judgment, not at the motion to dismiss stage.  *Id.* at 688.  "In addition, the statute in *American Express* was a revenue raising statute that did not touch on the economic protectionism that is of particular concern in *Craigmiles* and in this case."  *Bruner v. Zawacki*, 997 F.Supp.2d 691, 698 n.10 (E.D.Ky. 2014).

[66] *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)).  Of course, a statute need not always advance an economic interest.  Non-economic interests can also be legitimate state interests.

[67] *Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam); *Quinn v. Millsap*, 491 U.S. 95 (1989); *Allegheny Pittsburgh Coal Co. v. County Commission*, 488 U.S. 336 (1989); *Hooper v. Bernalillo County Assessor*, 472 U.S. 612 (1985); *Williams v. Vermont*, 472 U.S. 14 (1985); *Metropolitan Life Insurance Co. v. Ward*, 470 U.S. 869 (1985); *Plyler v. Doe*, 457 U.S. 202 (1982); *Zobel v. Williams*, 457 U.S. 55 (1982); *Chappelle v. Greater Baton Rouge Airport District*, 431 U.S. 159 (1977) (per curiam); *United States Department of Agriculture v. Moreno*, 413 U.S. 528 (1973); *James v. Strange*, 407 U.S. 128 (1972); *Lindsey v. Normet*, 405 U.S. 56 (1972); *Mayer v. City of Chicago*, 404 U.S. 189 (1971); *Turner v. Fouche*, 396 U.S. 346 (1970).

That's because liberty means more than placing the rights of political minorities at the mercy of political majorities. So too does equal protection. A law cannot be "wholly irrelevant" to any legitimate state interest.[68] It cannot be "arbitrary and irrational."[69] Instead, a law must be "reasonable, not arbitrary" and have "a fair and substantial relation" to its purpose.[70]

To be sure, that standard — arbitrary, irrational, unreasonable, or unrelated to its purpose — does not lend itself to precise or perfectly predictable applications. But at least this much about that standard should be clear: When a plaintiff's evidence proves that a statute makes worse the very interest it purports to serve, as well as any other legitimate state interest,[71] the statute is arbitrary, unreasonable, irrational, and unconstitutional.

When faced with that evidence, judges should not display a "disdain for facts."[72] True, judges must never substitute their policy judgment for that of elected legislators. But judges do not become policymakers when they apply the original meaning of constitutional text to a reality the state would prefer to disguise. Instead, they abdicate their judicial duty when they don't.[73]

---

[68] *Turner*, 396 U.S. at 362.

[69] *Lindsey*, 405 U.S. at 79.

[70] *F.S. Royster Guano Co. v. Commonwealth of Virginia*, 253 U.S. 412, 415 (1920); *see also id.* at 416 ("It is obvious that the ground of difference upon which the discrimination is rested has no fair or substantial relation to the proper object sought to be accomplished by the legislation.").

[71] *See St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013) (under rational-basis review, a plaintiff can "negate a seemingly plausible basis for the law by adducing evidence of irrationality").

[72] DAVID E. BERNSTEIN, REHABILITATING LOCHNER: DEFENDING INDIVIDUAL RIGHTS AGAINST PROGRESSIVE REFORM 46 (2011); *cf.*, *Bailey v. Alabama*, 219 U.S. 219, 238-9 (1911) ("That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law, or a denial of the equal protection of the law, it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.").

[73] *See Seal v. Morgan*, 229 F.3d 567, 579 (6th Cir. 2000) ("The fact that we must defer to the Board's rational decisions in school discipline cases does not mean that we must, or should, rationalize away its irrational decisions."); *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir. 1998) ("The rational basis test requires the court to ensure that the government has employed rational means to further its legitimate interest."); *cf. Berger v. City of Mayfield Heights*, 154 F.3d 621, 625 (6th Cir. 1998) ("In sum, we find that neither the City nor the district court have successfully articulated any rational basis to justify the onerous requirements imposed on the owners of vacant lots subject to C.O. 917.14(b) as

"The invalidation of legislation is not some extraordinary event in the life of a constitutional democracy; it is part of the original design."[74]

The alternative would unleash state power in the service of "not the public or common good but the good of a faction."[75]  It "would be the rule of the strong, not the rule of law."[76]  And it would distort the Constitution's "limitations upon popular democracy," which "are as much a part of the Constitution as the institutions of democracy itself."[77]

III.

Kentucky treats some health care companies differently than others.  Plaintiffs have plausibly alleged that those classifications don't rationally relate to a legitimate state interest.

A.

Kentucky treats home health start-ups differently than other health care companies in two ways.

First, some health care companies (like Plaintiffs' Grace Home Care) must obtain a Certificate of Need, while others can operate without one.[78]  For example, Kentucky does not

---

opposed to the owners of all other vacant lots, and no such rationale is apparent to this court.").  For an example of a Court that abdicated its judicial duty by displaying a disdain for facts, see *Plessy v. Ferguson*, 163 U.S. 537 (1896), overruled by *Brown v. Board of Education*, 347 U.S. 483 (1954).

[74] RICHARD A. EPSTEIN, Foreword to Stephen Macedo's *The New Right v. The Constitution* xii (1987).

[75] RANDY E. BARNETT, RESTORING THE LOST CONSTITUTION: THE PRESUMPTION OF LIBERTY at 341; *see also* THE FEDERALIST NO. 10 (J. Madison); *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 446-7 (1985) ("Furthermore, some objectives — such as a bare desire to harm a politically unpopular group — are not legitimate state interests.") (cleaned up)); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983) (distinguishing between legitimate state purposes and "providing a benefit to special interests"); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978) ("Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected."); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 538 (1949) ("the state may not use its admitted powers to protect the health and safety of its people as a basis for suppressing competition"); *Craigmiles*, 312 F.3d at 224 ("protecting a discrete interest group from economic competition is not a legitimate governmental purpose"); *Bruner*, 997 F. Supp. 2d at 698 (same).

[76] *McGirt v. Oklahoma*, 140 S.Ct. 2452, 2474 (2020).

[77] EPSTEIN at xii.

[78] *Compare* Ky. Rev. Stat. §§ 216B.061 & 216B.015(13) *with* Ky. Rev. Stat. § 216B.020(1).

require a Certificate of Need for doctors' offices, assisted-living residences, and group homes.[79] Even in the field of home health services, "a continuing care retirement community" can do business without a Certificate of Need when it provides home health services "to its on-campus residents."[80]

Second, even among health care companies that must have a Certificate of Need, Kentucky differentiates between the "need" required.  An existing hospital wishing to expand home health services must show that 50 would-be patients have an unmet need.  An existing home health company must show that 125 would-be patients have an unmet need.  And a new home health company (like Plaintiffs' Grace Home Care) must show that 250 would-be patients have an unmet need.

## B.

Kentucky's General Assembly says this Certificate of Need regime serves three purposes: It reduces costs, increases quality, and expands access to medical services.[81]  These purposes are undoubtedly legitimate, as Plaintiffs conceded at oral argument.  So the key question is whether requiring a Certificate of Need for home health start-ups rationally relates to those three legitimate state interests.[82]

---

[79] *Id.* at §§ 216B.020(2)(a) & 216B.020(1).

[80] *Id.* at § 216B.020(1).

[81] *See id.* at § 216B.010 ("[T]he proliferation of unnecessary health-care facilities, health services, and major medical equipment results in costly duplication and underuse of such facilities, services, and equipment; and . . . such proliferation increases the cost of quality health care within the Commonwealth. Therefore, it is the purpose of this chapter to fully authorize and empower the Cabinet for Health and Family Services to perform any certificate-of-need function and other statutory functions necessary to improve the quality and increase access to health-care facilities, services, and providers, and to create a cost-efficient health-care delivery system for the citizens of the Commonwealth."); DN 15 ¶ 69.

[82] *See United States Department of Agriculture v. Moreno*, 413 U.S. 528, 533 (1973).

1.

First, costs.  As a general matter, limiting supply does not lower consumer costs.[83]  Rather,

it raises them.[84]  This is "basic economics."[85]

Plaintiffs allege that there's "no evidence" of increased costs in states that have "eliminated

their certificate-of-need programs altogether."[86]  Here, Plaintiffs are alluding (albeit indirectly) to

an extensive line of scholarly research that "casts considerable doubt on the proposition that

[Certificate of Need] programs lead to reduced healthcare expenditures or that their repeal leads

to a surge in unnecessary services in the market":[87]

- In 1998, a study in Duke's peer-reviewed[88] *Journal of Health Politics, Policy, and Law* "found no evidence of a surge in acquisition of facilities or in costs following removal of [Certificate of Need] regulations.  The same study found that mature [Certificate of Need] programs were not associated with a significant reduction in per capita costs."[89]

- In 2003, a study in the peer-reviewed[90] *Inquiry: The Journal of Health Care Organization, Provision and Financing* "showed that states that repealed their [Certificate of Need] laws did not experience significant growth in either nursing home or long-term care costs."[91]

---

[83] DN 15 ¶ 187.

[84] *Id.* ¶ 188.

[85] DN 31 at #235; DN 46 at #338; *see also* OHLHAUSEN at 51 ("Normally, if you want the price of something to decline, creating an artificial shortage of it is not the way to achieve that.  There is no clear reason to expect that the basic laws of supply and demand would not apply, either when the states enacted the [Certificate of Need] laws or today.") (cleaned up); LAURETTA HIGGINS WOLFSON, *State Regulation of Health Facility Planning: The Economic Theory and Political Realities of Certificate of Need*, 4 DEPAUL JOURNAL OF HEALTH CARE LAW 261, 270 (2001) ("high medical costs were shown to be especially severe in areas controlled by [Certificate of Need]  laws") (cleaned up).

[86] *See* DN 15 ¶ 61.

[87] EMILY WHALEN PARENTO, *Certificate of Need in the Post-Affordable Care Act Era*, 105 KENTUCKY LAW JOURNAL 201, 228 (2017).

[88] DUKE       UNIVERSITY       PRESS,       *Submission       Guidelines*, https://read.dukeupress.edu/jhppl/pages/Submission_Guidelines.

[89] PARENTO at 227 (citing CHRISTOPHER J. CONOVER & FRANK A. SLOAN, *Does Removing Certificate-of-Need Regulations Lead to a Surge in Healthcare Spending?*, 23 JOURNAL OF HEALTH POLICY, POLITICS, & LAW 455, 469 (1998)).

[90] *Journal Description, Inquiry: The Journal of Health Care Organization, Provision, and Financing*, SAGE JOURNALS, https://journals.sagepub.com/description/inq.

[91] PARENTO at 227 (citing DAVID C. GRABOWSKI, *The Effects of CON Repeal on Medicaid Nursing Home and Long-Term Care Expenditures*, 40 INQUIRY 146, 154 (2003)).

- In 2007, a study in the peer-reviewed[92] *Health Education Journal* "showed that healthcare costs were, on average, higher in states with [Certificate of Need] programs."[93]

- In 2010, a "more rigorous" study in the *Journal of Healthcare Finances*, "concluded that [Certificate of Need] programs not only failed to correlate to lower costs, they might actually lead to *higher* costs per admission."[94]

The federal government agrees. Congress repealed its Certificate-of-Need mandate in 1986 because "the evidence showed that certificate-of-need programs resulted in increased health care costs."[95] In addition, the Department of Justice and the Federal Trade Commission "have taken an active position against the continuance of [Certificate of Need] programs."[96] For example, in 2004, they cited "considerable evidence that [Certificate of Need] programs can actually increase prices by fostering anticompetitive barriers to entry. Other means of cost control appear to be more effective and pose less significant competitive concerns."[97] They reaffirmed their opposition in 2007, 2008, and 2015.[98]

In sum, Plaintiffs may be on to something when they say Certificate of Need laws raise costs. And for home health in particular, the economics appear off: Nursing homes and hospitals

---

[92] *Journal Description*, *Health Education Journal*, SAGE JOURNALS, https://journals.sagepub.com/description/HEJ.

[93] PARENTO AT 227 (citing PATRICK A. RIVERS, *Does Certificate of Need Really Contain Hospital Costs in the United States?*, 66 HEALTH EDUCATION JOURNAL 229, 240-41 (2007)).

[94] *Id.* (citing PATRICK A. RIVERS, *The Effects of Certificate of Need Regulation on Hospital Costs,* JOURNAL OF HEALTHCARE FINANCE, Summer 2010, 1, 10-11). "While a 2014 study found lower hospital cost-inefficiency in [Certificate of Need] states than non-[Certificate of Need] states, as FTC Commissioner Ohlhausen observed, that particular study did not control for the possibility that the observed differences could be caused by many other differences between states without [Certificate of Need] laws, such as market and environmental characteristics, factors which were addressed in the 2010 study." *Id.* (citing MICHAEL D. ROSKO & RYAN L. MUTTER, *The Association of Hospital Cost-Efficiency with Certificate-of-Need Regulation*, 71 MEDICAL CARE RESEARCH AND REVIEW 280, 292-94 (2014)).

[95] DN 15 ¶ 55.

[96] PARENTO at 215; *see also* DN 15 ¶ 56 ("At least twice since 1986, the federal government has reaffirmed its conclusion that certificate-of-need programs raise costs and harm patients.").

[97] DN 15 ¶ 58.

[98] PARENTO at 215-18.

16

are more expensive than home health.[99]  Limiting home health care thus seems like a counter-productive way to reduce patient costs.[100]

2.

Second, access.  Generally, limiting the supply of home health care doesn't increase access to it.[101]  Specifically, the State Health Plan effectively bars new home health companies from opening in 114 of Kentucky's 120 counties.[102]  That seems like a recipe for *decreasing* Kentuckians' access to home health care.[103]

There's support for that suspicion in a report commissioned by Kentucky and submitted by the Intervening Defendant.  The Deloitte Report suggests that far more than 6 counties have an unmet need for home health care.[104]  And the Deloitte Report may actually understate the lack of access the Certificate of Need regime has created, since it shows Louisville needing no new services, while Plaintiffs know individuals in Louisville who can't access the home health care they need.[105]

Here again, academic research buttresses Plaintiffs' argument.  Although "supply of services is an imprecise metric,"[106] evidence measuring supply "seems to support the conclusion that [Certificate of Need] programs restrict access to care.  For example, a 2014 study by George Mason University showed that while the average state has 362 hospital beds per 100,000 population, this number falls to 263 hospital beds per 100,000 population in states with [Certificate

---

[99] DN 15 ¶ 30.
[100] *Id.* ¶ 164.
[101] *Id.* ¶ 187.
[102] *Id.* ¶ 82; DN 42 at #315-17.
[103] DN 15 ¶ 188.
[104] DN 48-2 at #461.
[105] DN 15 ¶¶ 40, 89, 163.
[106] PARENTO at 228; *see id.* ("the fact that providers are located in a given geographic area does not mean that they are willing to provide services to all patients").

of Need] programs."[107]  Another study "found no evidence" that those programs enhanced a state's ability to provide indigent care.[108]

At this point, you might wonder how anyone could have thought that capping the supply of medicine would ever increase access to it.  Well, the theory was that the government needed to incentivize capital investment in poor communities by promising a monopoly to companies that invested there.  So, for example, if a company spends millions building a hospital in a rural county, the government rewards the company by limiting its competition.  But regardless of whether that theory works out well in practice for poor patients outside the home health context — and, again, studies suggest it doesn't[109] —  the idea makes little sense here, where "[s]tarting a home health agency does not require a large capital investment."[110]

At least in the home health context, Plaintiffs may be right that Kentucky's Certificate of Need regime reduces access to care.

3.

Third and finally, quality.  In general, limiting the supply of home health care doesn't increase the quality of that care; if anything, limiting supply decreases quality.[111]

A Certificate of Need program promises better outcomes for patients "by ensuring an adequate volume of patients."[112]  So, for example, if you go to a surgeon who has performed 500 of the county's past 500 surgeries (because she hasn't had any competition), you might expect her to be better than the surgeon who has operated on patients only 5 times (because most of the

---

[107] *Id.* (citing THOMAS STRATMANN & JAKE RUSS, *Do Certificate-of-Need Laws Increase Indigent Care?* 11-12 (MERCATUS CENTER, GEORGE MASON UNIV., Working Paper No. 14-20, 2014)).
[108] *Id.* (citing STRATMANN & RUSS at 18).
[109] *Id.*
[110] DN 15 ¶ 27.
[111] *Id.* ¶¶ 187-8.
[112] PARENTO at 229.

18

county's patients chose her competitors).  And "evidence has shown that patients experience better outcomes in hospitals with expertise (usually measured as higher volume) in particular procedures."[113]

But here's the catch: the regulatory regime's promise is unkept.  The "link between volume and quality appears to be independent of the existence of a [Certificate of Need] program in a state.  Moreover, some evidence suggests that stringent [Certificate of Need] programs decrease the quality of care in many settings":[114]

- A 1988 study in the *New England Journal of Medicine* "showed higher mortality rates in hospitals in states with stringent [Certificate of Need] programs."[115]

- A 2009 study in *Health Services Research* "found that states that had dropped [Certificate of Need] regulations had lower mortality rates for [coronary artery bypass graft] surgery than states that kept their [Certificate of Need] programs."[116]

- An informal 2017 study in the *Kentucky Law Journal* concluded "hospitals in [Certificate of Need] states are approximately 50% more likely to be penalized [by Medicare] than those in non-[Certificate of Need] states."[117]

Proponents of Certificate of Need programs can point to other studies, including two about regulatory programs for heart surgery.[118]  And if the constitutionality of Kentucky's regime depended on the outcome of dueling academic studies, Kentucky would survive rational basis

---

[113] *Id.* (citing HIMANSHU J. PATEL, *Aortic Valve Replacement: Using a Statewide Cardiac Surgical Database Identifies a Procedural Volume Hinge Point*, 96 ANNALS THORACIC SURGERY 1560, 1565 (2013)).

[114] *Id.*

[115] *Id.* (citing STEPHEN M. SHORTELL & EDWARD F.X. HUGHES, *The Effects of Regulation, Competition, and Ownership on Mortality Rates Among Hospital Inpatients*, 318 NEW ENGLAND JOURNAL OF MEDICINE 1100, 1101, 1102 (1988)).

[116] *Id.* at 230 (citing VIVIAN HO, *Certificate of Need (CON) for Cardiac Care: Controversy Over the Contributions of CON*, 44 HEALTH SERVICES RESEARCH, 483, 493-96 (2009)) (cleaned up).

[117] *Id.* (cleaned up).

[118] *Id.* at 229 (citing M. S. VAUGHAN-SARRAZIN, *Mortality in Medicare Beneficiaries Following Coronary Artery Bypass Graft Surgery in States With and Without Certificate of Need Regulation*, 288 JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION 1859, 1859 (2002); JOSEPH S. ROSS, *Certificate of Need Regulation and Cardiac Catheterization Appropriateness After Acute Myocardial Infarction*, 115 CIRCULATION 1012, 1014-16 (2007)).

review.  But the issue here isn't the constitutionality of a Certificate of Need law for heart surgeons, or for any medical providers outside the context of home health.

Here, Plaintiffs plausibly allege that Kentucky's law isn't rationally related to Kentucky's interest in improving the quality of home health aides.  That allegation is bolstered by the critical importance of communication between patients and home health aides.  Kentucky laws make that communication worse.  They prevent members of Louisville's large Nepali-speaking community from accessing health care in their homes from people who speak their language.  That in turn hurts the health of those patients.[119]

Patients are more than numbers you plug in a formula.  Old or young, rich or poor, English-speaking or Nepali-speaking, each patient is unique.  And their unique health challenges are exacerbated when the patient and the aide literally don't speak the same language.

In that situation, the Alzheimer's patient has a harder time understanding directions that would be confusing even in her own language.  So too for the mentally sharp but physically disabled patient who must spend hours upon hours with a stranger in her home.  Of course, home health aides don't stay strangers, and the bond between the aide and the patient often becomes strong.  But the quality of that bond can depend on the quality of the communication.

When Plaintiffs say that the wellbeing of Nepali-speaking "patients and their families depend on access to Nepali-speaking home health care,"[120] that allegation makes a lot of sense. Regardless of whether Certificate of Need programs improve quality in other contexts, it's plausible that they diminish quality in the context of home health.

---

[119] DN 15 ¶ 38.
[120] DN 15 ¶ 89.

C.

If requiring a Certificate of Need for a home health company doesn't improve costs, access, or quality, what *does* it do?

Binding precedent helps answer the question.  In *Craigmiles v. Giles*, the Sixth Circuit found that a licensing requirement for the sale of caskets bore "no rational relationship to any of the articulated purposes of the state."[121]   It then reasoned that the "weakness" of a state's "proffered explanations" indicated that the regulatory regime "was nothing more than an attempt to prevent economic competition."[122]   The court reaffirmed that "protecting a discrete interest group from economic competition is not a legitimate governmental purpose."[123]

Admittedly, in *Powers v. Harris*, the Tenth Circuit reached a different result.[124]   Whereas the Sixth Circuit has said no law can "privilege certain businessmen over others at the expense of consumers,"[125] *Powers* limited that principle to interstate competition, rather than intrastate competition.[126]

Concurring only in part, Judge Tymkovich disagreed with that limitation.[127]  So did the Fifth Circuit.[128]  It held unconstitutional "the taking of wealth and handing it to others when it comes not as economic protectionism in service of the public good but as 'economic' protection of the

---

[121] 312 F.3d 220, 228 (6th Cir. 2002); *see also St. Joseph Abbey v. Castille*, 712 F.3d 215, 226-27 (5th Cir. 2013) ("The great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation.").

[122] *Craigmiles*, 312 F.3d at 225.

[123] *Id.* at 224 (citing cases); *cf. National Society of Professional Engineers v. United States*, 435 U.S. 679, 695 (1978) ("The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain — quality, service, safety, and durability — and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers.").

[124] 379 F.3d 1208 (2004).

[125] *Craigmiles*, 312 F.3d at 229.

[126] 379 F.3d at 1219.

[127] *Id.* at 1225-27 (Tymkovich, J., concurring in part and concurring in the judgment).

[128] *St. Joseph Abbey*, 712 F.3d 215.

rulemakers' pockets."[129]   Such wealth transfers were among the framing generation's chief concerns — transfers from weak factions to strong factions "who are united and actuated by some common impulse of passion, or of interest, adversed to the rights of other citizens, or to the permanent and aggregate interests of the community."[130]

Of course, the best security against national factions is the Constitution's vertical and horizontal separation of powers.   But the generation that ratified our Constitution supplemented its structural protections with a Bill of Rights, and the Civil War generation added still more protection against factions with the Fourteenth Amendment.   Through its Due Process and Equal Protection Clauses, the Constitution erects "a virtually *per se* rule of invalidity" when "simple economic protectionism is effected by state legislation."[131]

That principle carried the day six years ago when our sister district invalidated a Certificate of Need regime for moving companies in *Bruner v. Zawacki*.[132]   There, as in this case, Kentucky had either never or hardly ever issued a Certificate of Need to a start-up over an incumbent's protest.[133]   There, as is alleged here, the statute was an "act of simple economic protectionism" that bore no "rational relationship to *any* legitimate purpose other than protecting the economic interests of existing . . . companies."[134]

---

[129] *Id.* at 226-27.

[130] THE FEDERALIST NO. 10 (J. Madison); *cf. id.* ("[T]he most common and durable source of factions has been the various and unequal distribution of property.  Those who hold, and those who are without property, have ever formed distinct interests in society.  Those who are creditors, and those who are debtors, fall under a like discrimination.  A landed interest, a manufacturing interest, a mercantile interest, a moneyed interest, with many lesser interests, grow up of necessity in civilized nations, and divide them into different classes, actuated by different sentiments and views.") (cleaned up).

[131] *City of Philadelphia*, 437 U.S. at 624; *see also H.P. Hood & Sons, Inc.*, 336 U.S. at 538; *Energy Reserves Group, Inc.*, 459 U.S. at 413.

[132] 997 F. Supp. 2d 691 (E.D.Ky. 2014).

[133] *Id.* at 694.

[134] *Id.* at 698, 701 (cleaned up).

22

Here, even beyond the "weakness" of Kentucky's "proffered explanations,"[135] three rent-seeking features of Kentucky's health care program make it especially disturbing: the formula; the review process; and status of home health companies that operate in continuing care retirement communities.

As for the formula, it's easier for incumbents to expand their services than for start-up competitors to enter the market, which prevents the formula from showing a "need" for the start-ups.[136] And even if incumbents' expansion creates an adequate quantity of services, it doesn't capture the need for adequate quality. For example, Kentucky's formula says Louisville has services accessible to 929 more patients than are using those services.[137] But Plaintiffs personally know patients in Louisville who lack access to the quality of care they desire — *i.e.*, Nepali-speaking home health aides.[138]

Another constitutionally troubling component of the regime is Kentucky's review process, which allows incumbents to "veto" new business.[139] Patients aren't the ones saying the services of start-ups aren't needed.[140] No patient opposed Plaintiffs' application, and no patient has intervened in this lawsuit. Instead, an incumbent, Baptist Healthcare, successfully objected to the Plaintiffs' administrative application,[141] just like "all or almost all of the denied home health agency certificate-of-need applications were objected to by a direct competitor."[142] Then, when

---

[135] *Craigmiles*, 312 F.3d at 225.

[136] *See* DN 15 ¶¶ 125, 169. True, incumbents must obtain a Certificate of Need to expand their services. But that's easier for them than it is for start-ups. Incumbents can obtain a Certificate when there are only 50 or 125 patients in need, while start-ups can do so only when there are 250 patients in need.

[137] DN 15 ¶ 89.

[138] *Id.* ¶ 89.

[139] *Id.* ¶ 106.

[140] *Id.* ¶ 105; *cf. Bruner*, 997 F.Supp.2d at 694 ("no protest has ever been filed by a member of the general public").

[141] *See* DN 15 ¶ 119.

[142] *Id.* ¶ 123. *See* 997 F.Supp.2d at 694 ("In summary, the Cabinet has never issued a Certificate to a new applicant when a protest from a competing mover was made."); *id.* at 697 ("The evidence of record established that the denial is preordained where any protest is received.").

Plaintiffs filed this lawsuit, the Kentucky Hospital Association intervened, as if to prove the point that incumbents, not patients, are the only ones threatened by Plaintiffs' constitutional challenge.

Perhaps the most glaring evidence of rent-seeking is the statute's disparate treatment of most home health companies from home health companies that operate in continuing care retirement communities. Kentucky exempts the latter from its Certificate of Need requirement.[143] When both groups provide the exact same patient care, why distinguish between those serving patients in a private home (like Grace Home Care) from those serving patients in continuing care retirement communities? A plausible answer is that one group had better lobbyists than the other. If so, that is exactly the kind of "arbitrary classification" the Fourteenth Amendment prohibits.[144]

### D.

Kentucky and the Kentucky Hospital Association rely on two non-binding circuit court opinions.[145] In *Colon Health Centers of America, LLC v. Hazel*, the Fourth Circuit affirmed the district court's dismissal of plaintiffs' challenges to Virginia's Certificate of Need requirement for MRI machines.[146] In *Birchansky v. Clabaugh*, the Eighth Circuit affirmed the district court's grant of summary judgment on plaintiffs' challenges to Iowa's Certificate of Need requirement for outpatient surgery centers.[147]

Of course, neither case binds this Court. More than that, neither involved the home health context. That matters for two reasons.

First, as mentioned earlier, it doesn't cost much to start a home health agency. In fact, aside from regulatory expenses, you don't need much more than a qualified worker with a car and gas

---

[143] Ky. Rev. Stat. § 216B.020(1).
[144] *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 598 (2008) (cleaned up); *see also Berger*, 154 F.3d at 625 ("We find no rational basis for such arbitrary results.").
[145] DN 18-1 at #128; DN 42 at #291; DN 58.
[146] 733 F.3d 535, 548 (4th Cir. 2013).
[147] 955 F.3d 751, 759 (8th Cir. 2020).

money.[148]  You don't need to buy a CT scanner or MRI machine, as in *Colon Health*.[149]  And you don't need to construct a whole center for outpatient surgery, as in *Birchansky*.[150]

Because it doesn't cost much to start a home health agency, the government doesn't need to guarantee a home health company a monopoly in order to incentivize someone to make the capital investment for it.[151]  Perhaps that's why most states "have no certificate-of-need requirements for home health care agencies."[152]  And why most states contiguous to Kentucky, including Indiana, Illinois, Ohio, Missouri, and Virginia, don't subject home health agencies to those requirements.[153]  And why the states that don't require home health companies to have a Certificate of Need "have not experienced any negative health or safety consequences."[154]

Second, unlike patients getting colonoscopies, MRIs, or outpatient surgery, home health patients can't travel to a provider outside their county.  After all, the whole point of home health care is that it's *inside* your home.[155]  Patients in 114 of the Commonwealth's 120 counties can't access service from an innovative home health start-up.  But in the states covered by *Colon Health* and *Birchansky*, patients can travel to another county, or even another state, for innovative care from entrepreneurs providing the medical procedures at issue.

---

[148] *See* DN 15 ¶ 27.

[149] *Colon Health*, 733 F.3d at 541.

[150] *Birchansky*, 955 F.3d at 755.

[151] *See* DN 15 ¶ 186 ("No purported justification for certificates of need in other contexts, such as control of capital expenditures or cross-subsidization, exists in the home health context."); *see also id.* ¶ 185 ("Even if Kentucky's certificate-of-need program achieved any of its purported purposes for some types of health care services (which it does not), the certificate-of-need program does not achieve any legitimate state purpose in the home health context.").

[152] DN 15 ¶ 34; *cf. James v. Strange*, 407 U.S. 128, 139-40 (1972) ("Not only does this treatment not accord with the treatment of indigent recipients of public welfare or with that of other civil judgment debtors, but the Kansas statute also appears to be alone among recoupment laws applicable to indigent defendants in expressly denying them the benefit of basic debtor exemptions.").

[153] DN 48-2 at #460.

[154] DN 15 ¶¶ 193, 204.

[155] *Id.* ¶ 32.

25

In short, even if the regulatory schemes in *Colon Health* and *Birchansky* rationally related to legitimate state interests, those decisions merely mean Kentucky's Certificate of Need laws might be constitutional for CT scanners, MRI machines, and outpatient surgery centers.  They do not show how Kentucky's regime helps anyone in the home health context other than rent-seeking incumbents.[156]

* * *

Fernando Martinez was born in Cuba.  He was arrested as a teenager for running a restaurant without the government's permission. So he butchered his three pigs. He sold the meat. He used the money to buy parts for a homemade raft.  He sailed for Florida.  He survived a tropical storm.  He found his way to Louisville.  He spent the next eight years working in commercial kitchens.  He saved all his money.  He opened a Cuban restaurant called Havana Rumba.  He worked there 120 hours a week.  Then he opened a Mexican grill.  And then a burger bar.  And an Italian trattoria.  And later a steak house.  And a chain of taco shops.  And more.[157]

Today, Fernando Martinez is "unique in Louisville history, not only for the number of restaurants he's opened but for the variety of concepts."[158]  He is living proof that the American dream is real.

But think back to the moment in Martinez's story when he opened his first restaurant.  What if Kentucky had told him, "You must obtain a Certificate of Need"?  What if he had been required to show there were not already *enough* restaurants in Louisville?  What if his dream had depended on a formula created by a bureaucracy captured by a competitor like Olive Garden?

---

[156] *See id.* ¶¶ 185, 192, 207; *see also id.* ¶ 208 ("Kentucky's nakedly protectionist certificate-of-need program harms entrepreneurs, like Plaintiffs, and further deprives consumers of home health services of their right to choose their home health provider.").

[157] JEFFREY LEE PUCKETT, *Building a Food Empire: Since Fleeing Cuba, Bold Chef's Cuisine Concepts Have Spread*, THE COURIER-JOURNAL (Louisville, Kentucky), March 1, 2018, at A8.

[158] *Id.*

There are of course differences between the markets for food and medicine.  Even if a Certificate of Need program would be irrational in the restaurant industry, perhaps Plaintiffs will be unable to marshal the evidence in discovery to prove their allegations of irrationality in the context of home health care.  After all, in *Craigmiles*, the district court found the challenged Certificate of Need regime unconstitutional only after weighing the evidence at trial.[159]  And under rational-basis review, Plaintiffs have a heavy burden.

But for now, at the very least, Plaintiffs' allegations are plausible.[160]  On this limited record, there is every reason to think that Kentucky's law increases costs, reduces access, and diminishes quality — for no reason other than to protect the pockets of rent-seeking incumbents at the expense of entrepreneurs who want to innovate and patients who want better home health care.

Even in the best times, those entrepreneurs and patients depend on our Constitution to curb irrational state burdens on medicine.

We especially depend on it in a pandemic.[161]

Justin R. Walker, District Judge
United States District Court

8/14/2020

---

[159] 312 F.3d at 224.

[160] *Cf. Williams v. Vermont*, 472 U.S. 14, 28 (1985) ("It is conceivable that, were a full record developed, it would turn out that in practice the statute does not operate in a discriminatory fashion. . . .  We only hold that, when the statute is viewed on its face, appellants have stated a claim of unconstitutional discrimination.").

[161] *Cf. Why the U.S. Is Running Out of Medical Supplies*, THE DAILY (Mar. 31, 2020) (downloaded using Google Podcasts) (discussing how Certificate of Need laws have contributed to hospital bed shortages in the pandemic).