UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:19-CV-00884-GNS-CHL

DIPENDRA TIWARI, et al.                                          PLAINTIFFS

v.

ERIC FRIENDLANDER, et al.                                       DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' and Intervenor Defendant's Motion for Reconsideration (DN 68), Plaintiffs' Motion for Summary Judgment (DN 79), Defendants' and Intervenor Defendant's Motion for Summary Judgment (DN 84), Plaintiffs' Motion to Strike (DN 87), Plaintiffs' Motion to Withdraw their Motion to Strike (DN 89), Plaintiffs' Motion to Strike and Substitute (DN 90), and Defendants' and Intervenor Defendant's Motions in Limine (DN 93, 94). The matter is ripe for adjudication. For the reasons discussed below, the Court **GRANTS** Defendants' and Intervenor Defendant's Motion for Summary Judgment, Plaintiffs' Motion to Withdraw their Motion to Strike, and Plaintiffs' Motion to Strike and Substitute; **DENIES** Plaintiffs' Motion for Summary Judgment, Plaintiffs' Motion to Strike, and Defendants' and Intervenor Defendant's Motion for Reconsideration; and **DENIES AS MOOT** Defendants' and Intervenor Defendant's Motions in Limine.[1]

---

[1] Defendants and Intervenor Defendant request oral argument for both their Motion to Reconsider and Motion for Summary judgment, Plaintiffs similarly request oral argument for their Motion for Summary Judgment. The Court denies these requests, as it would not aid the Court. In addition, because the Court grants summary judgment for Defendants and Intervenor Defendant, their Motions in Limine are moot.

## I.     STATEMENT OF FACTS

Plaintiffs Dipendra Tiwari and Kishor Sapkota are both Nepalese immigrants to the United States who partnered in 2017 to form Plaintiff Grace Home Care, Inc. ("Grace"), a home health services agency ("HHA") (collectively "Plaintiffs").  (Tiwari Aff. ¶ 15, DN 79-3).  HHAs provide "part-time or intermittent health and health related services to a patient in his or her place of residence . . . as required by a plan of care prescribed by a license physician."  902 KAR 20:081 § 2.  Plaintiffs hope was to provide these services to the Nepalese-speaking community in the Louisville Metro area because of an unmet need for services in a patient's native language.  (Tiwari Aff. ¶ 15).  To open the agency, Plaintiffs were required to obtain a Certificate of Need ("CON") from the Commonwealth of Kentucky's Cabinet for Health and Family Services ("Cabinet").  The Commonwealth's CON program, established in 1980, requires anyone wishing to establish a "health facility," or make any substantial change to an existing health facility, to first obtain a CON.[2]  KRS 216B.061(1).  The purpose of the statute is to:  (1) improve the quality of healthcare in the Commonwealth; (2) improve access to healthcare facilities, services, and providers; and (3) create a cost-efficient healthcare delivery system.  *See* KRS 216B.010.  The program is meant to accomplish these goals by preventing the "proliferation of unnecessary health-care facilities, health services, and major medical equipment . . . ."  *Id.*

Plaintiffs applied for a CON and were denied because Grace did not show a need for its services in the area.  (Pls.' Mot. Summ. J. Ex. 25, DN 79-30).  Plaintiffs then filed suit against various state officials and agencies, alleging the CON program, as applied to HHAs, violated the

---

[2] The term "health facility" refers to "any institution, place, building, agency, or portion thereof, public or private, whether organized for profit or not, used, operated, or designed to provide medical diagnosis, treatment, nursing, rehabilitative, or preventive care and includes alcohol abuse, drug abuse, and mental health services."  KRS 216B.015(13).

Due Process, Equal Protection, and Privileges or Immunities Clauses of the Fourteenth Amendment. (Compl., DN 1; Am. Compl., DN 15). Kentucky Hospital Association, Inc. ("KHA"), intervened, and Defendants and KHA moved to dismiss. (Mem. Op. & Order, DN 40; Defs.' Mot. Dismiss, DN 18; Intervenor Def.'s Mot. Dismiss, DN 42). The Court granted in part and denied in part the motion, allowing Plaintiffs' claim for violation of the Due Process and Equal Protection Clauses to proceed against Eric Friedlander, in his official capacity as Acting Secretary of the Cabinet, and Adam Mather, in his official capacity as Inspector General of Kentucky ("Defendants"). (Mem. Op. & Order 1, DN 67). Furthermore, the Court found that Grace had standing, but ordered Plaintiffs to show cause why they have standing as individuals. (Mem. Op. & Order 1).

Defendants and KHA jointly moved for reconsideration on the Court's Order denying the motion to dismiss. (Defs.' & Intervenor Def.'s Joint Mot. Reconsideration, DN 68). Plaintiffs responded to the Court's show cause order, and moved for summary judgment. (Pls.' Br., DN 72; Pls.' Mot. Summ. J., DN 79). Defendants and KHA responded to Plaintiffs' motion for summary judgment with a cross-motion.[3] (Defs.' & Intervenor Def.'s Mem. Supp. Joint Mot. Summ. J. & Resp. Pls.' Mot. Summ. J., DN 84 [hereinafter Defs.' Mot. Summ. J.]). Fully briefed on the matter, the Court finds that Plaintiffs have standing, grants Defendants' and KHA's Motion for Summary Judgment, denies Plaintiffs' Motion for Summary Judgment, and denies as moot Defendants' and KHA's Motion for Reconsideration.

---

[3] Plaintiffs also moved to strike an untimely affidavit, but subsequently moved to withdraw their motion, and to strike and substitute their response, which addressed the motion to strike the affidavit. (Pls.' Mot. Strike, DN 87; Pls.' Mot. Withdraw, DN 89; Pls.' Mot. Strike & Substitute, DN 90). The Court grants Plaintiffs' motion to withdraw and motion to strike and substitute, and denies as moot Plaintiffs' motion to strike.

## II.       STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Rather, the non-moving party must demonstrate that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment.  *Anderson*, 477 U.S. at 252.

## III.       DISCUSSION

### A.       Standing

Although both parties recognize Grace has standing to pursue these claims, Defendants and KHA dispute whether the individual Plaintiffs have standing.  Plaintiffs assert that although it is enough for Grace to have standing, they too have standing to bring the case because the CON laws prohibit them from opening an agency, whether through Grace or another entity.  (Pls.' Br. 2).

Defendants and KHA maintain that each party must have standing on their own to proceed, and that Plaintiffs do not suffer an injury separate from their status as shareholders.  (Intervenor-Defs.' Br. 2-4, DN 74; Defs.' Br. 2-4, DN 76).  Furthermore, Defendants and KHA argue that any harm Plaintiffs suffer individually from their inability to open another HHA is speculative.  (Intervenor-Def.'s Br. 2-6; Defs.' Br. 4-5).

Plaintiffs' standing must be established as a threshold matter.  *See Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017).  To establish standing a plaintiff must demonstrate:  (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "'At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice'; more is required to defeat a motion for summary judgment, and even more is required for a decision on the merits."  *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009) (citing *Lujan*, 504 U.S. at 561).

The Supreme Court has held that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 53 n.2 (2006) (citation omitted).  Specifically, "when one party has standing to bring a claim, the *identical claims* brought by other parties to the same lawsuit are justiciable." *Phillips v. Snyder*, 836 F.3d 707, 714 (6th Cir. 2016) (emphasis added) (citation omitted); *see also Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015) ("A plaintiff must have standing for each claim pursued in federal court.  However, only one plaintiff needs to have standing in order for the suit to move forward."  (internal citation omitted) (citation omitted)); *Am. Civil Liberties Union of Ky. v. Grayson Cty.*, 591 F.3d 837, 843 (6th Cir. 2010) ("The presence of one

party with standing is sufficient." (citations omitted)). Therefore, Plaintiffs must show that at least one named Plaintiff has standing to bring these claims.

"[E]ach form of relief sought must pass the court's justiciability requirements for the plaintiff." *Priorities USA v. Benson*, 448 F. Supp. 3d 755, 761 (E.D. Mich. 2020) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)); *see also Davis v. FEC*, 554 U.S. 724, 734 (2008) ("'[S]tanding is not dispensed in gross.' Rather, 'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." (alteration in original) (internal citation omitted) (citation omitted)). Ultimately, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017).

In this instance, neither party disputes that Grace and the individual Plaintiffs not only pursue the same claims but seek the same relief. Accordingly, because Grace has standing, Plaintiffs have standing. *See, e.g.*, *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 652 (6th Cir. 2007) (holding "it is only necessary that one plaintiff has standing" and where, as here, an injunction is predicated on a declaratory judgment "it follows that if the plaintiffs [have] standing to litigate their declaratory judgment claim, they must also [have] standing to pursue an injunction. The question is whether *any* plaintiff has standing to litigate the declaratory judgment claim."); *see also Priorities USA*, 448 F. Supp. 3d at 761 ("The court will not decide new issues outside of 'identical claims' brought by a plaintiff with standing and will not add damages or remedies based on claims brought by a plaintiff lacking standing." (citing *Phillips*, 836 F.3d at 714 n.2)). Defendants and KHA are correct that "a shareholder of a corporation does not have a personal or individual right of action based solely on an injury to the corporation[,]" but the Court already held that Grace has standing. *Gaff v. FDIC*, 814 F.2d 311, 315 (6th Cir.), *on reh'g in part*,

828 F.2d 1145 (6th Cir. 1987).   Accordingly, the Court will allow the individual Plaintiffs to proceed.[4]

## B.   CON Laws

Plaintiffs challenge the Commonwealth's CON laws for failing to relate rationally to any legitimate interest in violation of the Due Process Clause and for irrational discrimination in violation of the Equal Protection Clause.

### 1.   *The CON Process*

The first step for an entity seeking a CON is to apply to the Office of Inspector General ("OIG") of the Cabinet for Health and Family Services ("Cabinet").   KRS 216B.062.   Applications are evaluated using five statutory criteria:   (1) consistency with plans; (2) need and accessibility; (3) interrelationships and linkages; (4) costs, economic feasibility, and resources availability; and (5) quality of services.[5]   Both parties essentially recognize the crux of the CON laws are the "consistency with plans" and "need and accessibility" criteria.   (Pls.' Mot. Summ. J. 4; Sullivan Dep. 110:6-113:25, Sept. 25, 2020, DN 79-8).

---

[4] Plaintiffs have also shown individual standing because they are "seeking 'prospective injunctive relief against enforcement of an occupational certification procedure that is allegedly unconstitutional.'"   *Truesdell v. Friedlander*, No. 3:19-CV-00066-GFVT, 2020 WL 5111206, at *3 (E.D. Ky. Aug. 31, 2020) (citation omitted).   For example, in the CON context, the Eastern District of Kentucky held that an ambulance service agency and its individual owners had standing, without distinguishing between them. *See id.* at *4 ("Plaintiffs have suffered an injury in fact due to their inability to receive a CON without first undergoing the challenged process."); *see also Birchansky v. Clabaugh*, 421 F. Supp. 3d 658, 672 (S.D. Iowa 2018), *aff'd*, 955 F.3d 751 (8th Cir. 2020) ("Because it is the entity through which [the individual plaintiff] administers his professional services, [the corporation] has an injury in fact under the same theory.   Accordingly [both] . . . have standing specific to their own circumstances to challenge the constitutionality of the CON framework.").

[5] Applications may be eligible for formula review, which requires all five factors, or non-substantive review, which is evaluated for consistency with the State Health Plan and the need criterion only, and there is a presumption of consistency with both.   KRS 216B.095.

The "consistency with plans" criterion requires the applicant's proposal be consistent with the State Health Plan for a type of facility or service. KRS 216B.040(2)(a)(2)(a), 216B.015(28). Specifically, the State Health Plan for establishing or expanding a HHA, like Grace, is based on a formula that provides the annual calculated "need" for services in each county.[6] (Defs.' & Intervenor Def.'s Joint Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. Ex. 1, at 32, DN 84-3); *see also* 900 KAR 5:020. To determine the need for each county, the formula looks at the statewide use rates of home health services for respective age groups averaged over the previous two years. For each county, the formula multiples these base rates by the county's projected population in each age group and then totals them. The result is an estimate of how many people are expected to use home health services in each county. The formula then subtracts the patients in the county who used services, averaged over the last two years, to establish the statutory "need". If the State Health Plan calculation yields a need of at least 250 patients in a county, an application to establish a new HHA can move forward; if the plan yields a need of at least 125 patients, an application to expand an existing HHA may proceed. (*See* Defs.' & Intervenor Def.'s Joint Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. Ex. 1, at 32).

The "need and accessibility" criterion requires that the applicant show that the proposal meets an identified need in a defined geographic area and that it will be accessible to all residents of the area.[7] KRS 216B.040(2)(a)(2)(b). To satisfy this criterion, an applicant must pay an

---

[6] To establish a HHA means "to establish a parent home health agency or a subunit as defined by Medicare in a county . . . ." (Defs.' & Intervenor Def.'s Joint Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. Ex. 1, at 32). To expand a HHA means "to add to the applicant's existing service area a Kentucky county or counties that are contiguous to the applicant's existing service area if the expansion does not involve the establishment of a parent home health agency or subunit as defined by Medicare." (Defs.' & Intervenor Def.'s Joint Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. Ex. 1, at 32).

[7] The third criterion, "interrelationships and linkages", requires the applicant to show that it will have appropriate and effective linkages with other healthcare services and facilities to ensure

application fee of at least $1,000 and complete a 20-page, 3,500-word application. *See* 900 KAR 6:020; (Pls.' Mot. Summ. J. Ex. 17, DN 79-22). Commonly, applicants seek out letters of support from community members, including politicians, and hire CON consultants, that can cost as much as $15,000, to complete the process. (Sullivan Dep. 79:14-80:14; 82:7-8; 73:21-25; 75:4-12).

After submission of an application, the Cabinet puts it on public notice. 900 KAR 6:060 §§ 2-3. An "Affected Person", including the applicant or its competitors, may then request a public hearing before an officer to adjudicate the application based upon a hearing and administrative record.[8] KRS 216B.085(1), 216B.015(3). If no hearing is requested, the officer makes a final decision upon the application alone.[9] A final decision granting or denying an application may be appealed to Franklin Circuit Court. KRS 216B.115.

### 2. *Due Process*

Plaintiffs contend the CON program is not rationally related to the statutorily enumerated government interest or any other conceivable interest. The Due Process Clause of the Fourteenth Amendment provides that a state may not deprive a citizen of life, liberty, or property without due process of law. U.S. Const. amend. XIV § 1. "The Fourteenth Amendment 'prohibits the government from imposing impermissible substantive restrictions on individual liberty,' for example, a liberty interest to engage in a chosen occupation." *Truesdell*, 2020 WL 5111206, at *6

comprehensive care, proper utilization of services, and efficient functioning of the healthcare system. KRS 216B.040(2)(a)(2)(c). The "costs, economic feasibility and resources availability" criterion requires the applicant to establish that its "proposal, when measured against the cost of alternatives for meeting needs, shall be judged to be an effective and economical use of resources, not only of capital investment, but also ongoing requirements for health manpower and operational financing . . . ." KRS 216B.040(2)(a)(2)(d). The "quality of services" criterion requires the applicant to demonstrate that it will provide quality healthcare services. KRS 216B.040(2)(a)(2)(e).

[8] The hearing mirrors an adversarial trial and can last from two to five days. (Sullivan Dep. 89:8-17; 90:17-24; 92:11-16; 102:16-103:18; 94:6-21).

[9] The entire process usually takes half a year. (Sullivan Dep. 180:23-181:1).

9

(citing *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999)).  "Generally speaking, freedom to choose and pursue a career, 'to engage in any of the common occupations of life,' qualifies as a liberty interest which may not be arbitrarily denied by the State."  *Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983) (internal citation omitted).  "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (citations omitted).  The parties agree rational basis review applies because a fundamental right is not at issue.

> A law subject to rational basis review is constitutionally valid if:

> there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (internal citations omitted) (citation omitted).

> [R]egulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators.

*United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938).  An "as-applied challenge to the [] [CON]'s constitutionality is subject to the same rational basis review as [a] facial challenge." *Heller v. Ross*, 682 F. Supp. 2d 797, 807 (E.D. Mich. 2010).

Under rational basis review laws are "accorded a strong presumption of validity."  *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993).  Furthermore, a legislature need not "actually articulate at any time the purpose or rationale supporting its classification."  *Nordlinger*, 505 U.S. at 15 (citation omitted).  In fact, courts can conceive of other rational bases and are "not bound by the

explanations of the statute's rationality that may be offered by litigants or other courts." *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 463 (1988). "The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Madden v. Kentucky*, 309 U.S. 83, 88 (1940) (citation omitted).

"Judicial invalidation of economic regulations under the Fourteenth Amendment has been rare in the modern era." *Craigmiles v. Giles*, 312 F.3d 220, 229 (6th Cir. 2002) (citation omitted). "This standard is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances." *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007). It is fair to say that rational basis review "is not a rubber stamp of all legislative action . . . ." *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000) (citation omitted). Ultimately, however, the rational basis standard "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Beach Commc'ns, Inc.*, 508 U.S. at 313. In the end, "[w]here there are 'plausible reasons' for [the legislature's] action, '[the court's] inquiry is at an end.'" *Id.* at 313-14 (citation omitted).

As a preliminary matter, Plaintiffs raise the issue of whether evidence can be used to overcome this standard. (*See* Pls.' Mot. Strike & Substitute Ex. 1, at 2, DN 90-1 [hereinafter Pls.' Resp. Defs.' Mot. Summ. J.]). Plaintiffs have marshalled numerous academic studies and statistical analyses which they insist provide overwhelming evidence that the CON laws harm the very interests it was meant to advance and is thus irrational. Defendants and KHA respond that a state's rational speculation is sufficient and that the Commonwealth is not saddled with a post-hoc evidentiary burden. (Defs.' Mot. Summ. J. 12-15). Defendants and KHA maintain the only issue is whether there is a conceivable rational relationship between the law and its purpose, not if the law is reasonable in practice or supported by evidence. (Defs.' Mot. Summ. J. 13).

"A State . . . has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller*, 509 U.S. at 320. "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns, Inc.*, 508 U.S. at 315 (citation omitted). To Plaintiffs' point, "parties challenging legislation . . . may introduce evidence supporting their claim that it is irrational . . . ." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) (citing *Carolene Prods. Co.*, 304 U.S. at 153-54). But the question is not, as they contend, whether the evidence shows the law "is so clearly a mistake that it is irrational." (Pls.' Resp. Defs.' Mot. Summ. J. 4). For the state's policy decisions "need not be supported by scientific studies or empirical data; *nor need they be effective in practice*." *Sheffield v. City of Fort Thomas*, 620 F.3d 596, 614 (6th Cir. 2010) (emphasis added) (citation omitted). "[P]roffered explanation for the statute need not be supported by an exquisite evidentiary record; rather [the court] will be satisfied with the government's 'rational speculation' linking the regulation to a legitimate purpose, even 'unsupported by evidence or empirical data.'" *Craigmiles*, 312 F.3d at 224 (citations omitted). In fact, "[t]he assumptions underlying these rationales may be erroneous, but the very fact that they are 'arguable' is sufficient . . . ." *Beach Commc'ns, Inc.*, 508 U.S. at 320 (citation omitted). Ultimately, "litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." *Clover Leaf Creamery Co.*, 449 U.S. at 464.

Plaintiffs are correct that "[j]ust because the government does not have the burden of proof does not mean there is no burden of proof." (Pls.' Resp. Defs.' Mot. Summ. J. 4). But the court may only consider evidence of the factual circumstances underlying the policy which will show the assumptions or speculations supporting it, though permissibly erroneous, were impermissibly irrational. Specifically, evidence is only relevant for the question of whether Kentucky's

12

legislature "*rationally could have believed* that the [CON laws] [] would promote its objective." *W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 672 (1981) (citations omitted). The court is not, however, looking for evidence that the law did not subsequently work or even that it is counterproductive. *See James v. Strange*, 407 U.S. 128, 133 (1972) ("Misguided laws may nonetheless be constitutional. . . . Our task, however, is not to weigh this statute's effectiveness but its constitutionality."); *see also Fowler v. Benson*, 924 F.3d 247, 262 (6th Cir. 2019) (holding that even a counterproductive law can pass rational-basis review).

With this is mind, much of Plaintiffs' evidence regarding the effects of Kentucky's CON laws is irrelevant to whether there is any reasonably conceivable state of facts that could provide a rational basis for it.[10] Thus, we can address the question at hand. Neither party disputes the Commonwealth's interest in regulating healthcare agencies to promote cost-efficient, accessible, and quality health care services. The only dispute is whether the CON laws are rationally related to these goals.[11]

---

[10] Plaintiffs cite cases where the issue was decided on evidence or at trial, specifically *Craigmiles* and a similar case, *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013), where the courts invalidated a protectionist law. *See also Bokhari v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:11-00088, 2012 WL 1165907, at *6-8 (M.D. Tenn. Apr. 9, 2012) ("*Craigmiles*, which was decided after a trial on the merits . . . ."). Initially, the Sixth Circuit has explained "there is an outcome-determinative distinction [on] those 'rational basis with a bite' decisions . . . . In each . . . [the] Court concluded that the legislation at issue was in fact intended to further an improper government objective." *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 691-93 (6th Cir. 2011) (citing *Craigmiles*). As discussed below, unlike *Craigmiles* there are rational bases that support the CON laws at issue here, beyond mere protectionism. *See also Hines v. Quillivan*, 982 F.3d 266, 274 (5th Cir. 2020) ("We do not read *St. Joseph Abbey* to hold that a plaintiff alleging an equal-protection claim is always entitled to present evidence . . . . *St. Joseph Abbey* dealt with a 'purported rational basis that rose to the level of 'fantasy.'" (internal citation omitted) (citation omitted)). More importantly, *Craigmiles* plainly held: "Our decision today is not a return to *Lochner*, by which this court would elevate its economic theory over that of legislative bodies. No sophisticated economic analysis is required to see the pretextual nature of the state's proffered explanations . . . ." *Craigmiles*, 312 F.3d at 228-29 (internal citation omitted).
[11] Plaintiffs initially argue the CON laws were enacted to limit services to what was needed to reduce costs under the old Medicare "cost-plus" scheme, which has since been abolished. (Pls.'

13

a.      **Cost-efficiency**

Defendants and KHA maintain that Kentucky CON laws rationally relate to cost-efficiency because without limiting the market of HHAs to a projected need, the resulting proliferation of HHAs could cause a reduction in patient volume in each agency, harming the important benefits associated with economies of scale.  (Defs.' Mot. Summ. J. 9-10).  Plaintiffs argue that restraining markets could not rationally serve the purpose of providing reasonable rates citing *Medigen of Kentucky, Inc. v. Public Service Commission of West Virginia*, 985 F.2d 164 (4th Cir. 1993), for the proposition that the "goal of providing universal service at reasonable rates may well be a legitimate state purpose, but restricting market entry does not serve that purpose."  (Pls.' Mot. Summ. J. 16 (citing *Medigen of Ky., Inc.*, 985 F.2d at 167)).  But *Medigen* was a Commerce Clause case and, as the Fourth Circuit also held, "[u]nlike the Commerce Clause, the Fourteenth Amendment is not primarily focused on commerce and economic discrimination against out-of-state interests, and its general provisions provide correspondingly less warrant for close judicial supervision."  *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 548 (4th Cir. 2013).  Furthermore, the issue in *Medigen* was whether a statute requiring transporters of medical waste to obtain a CON was related to the goal of providing broad access throughout the state while also ensuring reasonable rates.  *Medigen of Ky., Inc.*, 985 F.2d at 167.  Defendants and KHA here contend the CON laws rationally promote cost-efficiency, not simply a reduction in rates.

Defendants and KHA have maintained throughout the lawsuit that "[r]educing costs and creating a cost-efficient system are not always the same objective."  (Defs.' & Intervenor Def.'s

---

Mot. Summ. J. 14 (citing *Carolene Prods. Co.*, 304 U.S. at 153 ("[C]onstitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."))).  Regardless if this is true, Plaintiffs still must negate *every* conceivable basis for the law.  *See Madden*, 309 U.S. at 88.

Mot. Reconsideration 6 n.3, DN 68).  Defendants and KHA argue "[r]educing costs is easy.  One can quickly reduce costs by lowering quality, reducing access, or limiting services.  Creating a cost-efficient system is much harder."  (Defs.' & Intervenor Def.'s Mot. Reconsideration 6 n.3). Defendants and KHA posit that one example of cost-efficiency resulting from the CON laws is the ability to buy supplies and equipment in bulk at reduced prices due to the increased patient volume funneled to the HHAs.  (Defs.' Mot. Summ. J. 10).  Plaintiffs maintain, however, this is irrational because a strict pursuit of economies of scale would lead to the absurd result of only one HHA. (Pls.' Mot. Summ. J. 16-17).  Of course, the CON laws on their face do not strictly pursue this theory, as evidenced by the fact that multiple HHAs exist in the Commonwealth.  Plaintiffs also contend the CON laws were intended to regulate major capital investments that could lead to the wasteful duplication of MRI machines, hospital beds, etc., but that HHAs do not require large capital investment because they are primarily based on labor.  (Pls.' Mot. Summ. J. 14).  The CON laws were not enacted solely for capital investment, however, but for increased access to quality care through cost-effective services.  (Defs.' Mot. Summ. J. 25).  Defendants and KHA show that HHAs are expensive to operate and similarly benefit from economies of scale.  (Defs.' Mot. Summ. J. 25).  It was entirely conceivable for Kentucky's General Assembly to have believed that the CON laws would result in fewer HHAs, which would result in sufficient patient volume, contributing to economies of scale and a more cost-efficient agency.  Plaintiffs have not shown that this belief was irrational in the HHA context.

### b.    Quality

Defendants and KHA have similarly pointed to the plausible effects of the CON laws in the realm of HHA quality, maintaining there is a plausible relationship between patient volume and an agency's ability to offer better programs.  (Defs.' Mot. Summ. J. 9).  Essentially,

Defendants and KHA contend that without a CON law, HHA proliferation in the marketplace would reduce patient volume at individual agencies and the resulting loss of economies of scale could harm an agency's ability to leverage resources to offer programs that enhance quality of care.  (Defs.' Mot. Summ. J. 9).  Plaintiffs counter that incumbents without competitors tend to provide lower quality services.  (Pls.' Mot. Summ. J. 19).  Ultimately, this dispute shows that although "[t]he assumptions underlying [Defendants' and KHA's] rationales may be erroneous, . . . the very fact that they are arguable is sufficient . . . ."  *Beach Commc'ns, Inc.*, 508 U.S. at 320 (citation omitted).

Plaintiffs contend that in the HHA context, patient-volume sensitivity is irrelevant because the nurse labor force staffing HHAs tend to work at full capacity.  (Pls.' Mot. Summ. J. 21 n.26).  Defendants and KHA show, however, that for HHAs, sufficient patient volume is critical to the ability of an agency to also provide specialized programs, beyond basic services, for example, services for heart failure, COPD, diabetes, vestibular/balance conditions, psychiatric diseases, neurological conditions, or orthopedic issues.  (Defs.' Mot. Summ. J. 9).  The General Assembly could have reasonably concluded "[t]hese programs, and the specialized caregivers needed to staff them, simply would not be financially feasible if the agency did not have an adequate number of patients over which to spread the costs."  (Defs.' Mot. Summ. J. 9-10).

Plaintiffs argue the CON laws are a circuitous path to insuring quality services because the Commonwealth has a separate licensure requirement for HHAs.  (Pls.' Mot. Summ. J. 22).  "The Supreme Court, employing rational basis review, has been suspicious of a legislature's circuitous path to legitimate ends when a direct path is available."  *Craigmiles*, 312 F.3d at 227.  Defendants and KHA respond, however, that requiring licensure without a CON law could result in an unfunded mandate for quality.  (Defs.' & Intervenor Def.'s Reply Mot. Summ. J. 11, DN 92

[hereinafter Defs.' Reply]).  For example, "[t]he state could require all HHAs to have [computer] tablets at the bedside, but if there is no CON law to help ensure that HHAs will have sufficient patient volume, HHAs will not be able to comply." (Defs.' Reply 11).  Defendants and KHA show that sufficient patient volume guaranteed by the CON laws could allow HHAs to invest in technological upgrades that are arguably only possible with sufficient patient volume and that could increase quality of care even beyond standards for licensure.  It is similarly conceivable that, for HHAs, market exit may be more attractive than investing in quality when compared to other sectors where losses are greater from exiting.  (Defs.' Reply 11).

This raises an additional basis for the CON laws that supplements the effects of a licensure requirement, namely, stability.  The Commonwealth's interest in quality of care extends not only to ensuring types of services, but the stable provision of services.  It is entirely plausible for the General Assembly to have believed that leaving HHAs to the fluctuations of the market could lead to disruptions in care when HHAs close or downsize due to expensive quality standards, insufficient profits, or any other similar reason.  Although Plaintiffs maintain it is irrational to believe patients moving to better agencies could have a net effect on quality, this dispute highlights its arguable basis.  (Pls.' Resp. Defs.' Mot. Summ. J. 23).

"[E]ven if [Plaintiffs] have found a superior system, the Constitution does not require the [Commonwealth] to draw the perfect line nor even to draw a line superior to some other line it might have drawn." *Armour v. City of Indianapolis*, 566 U.S. 673, 686 (2012).  "It is enough that there is an evil at hand for correction, and that it *might* be thought that the particular legislative measure was a rational way to correct it." *Kutrom Corp. v. City of Ctr. Line*, 979 F.2d 1171, 1174 (6th Cir. 1992) (quoting *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 487-88 (1955)).  Through the CON laws, the Commonwealth has valued the plausible benefits of stable care in the

HHA context above the plausible benefits of unfettered competition.  Plaintiffs may reasonably dispute this theory in general, but they have not shown that it was *irrational* to believe the CON laws would result in quality services in the HHA context.[12]

### c.    Access

Plaintiffs also contest the CON laws' ability to increase access to HHAs in Kentucky, asserting that limiting the number of HHAs to increase access is irrational.  (Pls.' Mot. Summ. J. 17).  Plaintiffs specifically question Defendants' and KHA's contention that without a CON law, HHAs would proliferate in profitable urban areas, leaving rural areas underserved.  (Pls.' Mot. Summ. J. 18).  Defendants' and KHA's position seems to imply that CON laws force agencies wishing to open a HHA to essentially "take what they can get."  The First Circuit, in *Walgreen Co. v. Rullan*, 405 F.3d 50 (1st Cir. 2005), rejected this argument in the Commerce Clause context and held "the refusal to grant a proposed pharmacy market entry at its desired location will not encourage the proposed pharmacy to relocate to an underserved area (unless the government provides other incentives for it to do so)."  *Id.* at 60.  The Court noted:

> Presumably areas are underserved because pharmacies have determined that these locations are unlikely to be profitable.  For this reason, the denial of a [CON] [] is likely to lead a pharmacy to seek to open in another potentially profitable (and therefore probably already served) area or to withdraw from the [state] [] market entirely.

---

[12] Plaintiffs maintain that because the CON laws forbid their business from opening, by definition, Nepali-speaking patients are not receiving quality care because of the linguistic mismatch with English-speaking staff.  (Pls.' Resp. Defs.' Mot. Summ. J. 23).  Accepting as true Plaintiffs' contention that receiving care in one's native language is important to quality care, HHAs are already required to have language interpretation services for Nepali speakers.  42 C.F.R. § 484.50(f).  In fact, Defendants and KHA have pointed to a HHA in the Louisville Metro area providing video translation services to Nepali-speaking patients.  (Defs.' & Intervenor Def.'s Joint Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. Ex. 8, ¶ 16, DN 84-10).  While perhaps not a perfect solution, "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations . . . ."  *Metropolis Theater Co. v. Chicago*, 228 U.S. 61, 69 (1913).

*Id.*  Although the Commerce Clause requires a more exacting standard than the Due Process Clause, the Defendants and KHA have not argued any additional government incentives that make this argument any less attenuated under rational basis review in the HHA context.

Defendants and KHA alternatively argue CON laws help prevent for-profit HHAs from *opening* in rural areas and poaching lucrative patients, which would destabilize existing agencies and potentially leave its low-income patients without stable access to care.  (Defs.' Mot. Summ. J. 22).  Further, though serving Medicaid or underinsured populations is not required to receive a CON, an agency's participation in a Medicaid waiver program for indigent patients is a positive factor in evaluation of CON applications.  (Defs.' Joint Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. Ex. 2, at 26, DN 84-4); *see Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 156 (4th Cir. 2016) ("[T]he CON program may help underserved and indigent populations access needed medical care.  Certificates of need may be granted on the condition that the recipients provide a certain level of indigent care each year."  (citations omitted)).  Defendants' and KHA's position is premised on the assumption that HHAs are currently using profits to provide care at a loss for numerous unprofitable patients.  Accordingly, it is entirely plausible that absent a CON law, new HHAs could target better-paying populations in rural areas, which could leave the burden of serving the less well-insured patients upon existing HHAs, thus reducing access to cost-efficient, stable, and quality care for these patients.

Plaintiffs have not negated every conceivable basis for the Commonwealth's CON program in the HHA context, and therefore, have not shown a violation of the Due Process Clause.

### 3.     *Equal Protection*

Plaintiffs contend the CON program irrationally treats new HHAs differently from similarly situated existing HHAs and that the program's exceptions are irrational.  As a sister court

held, "the challenged provisions [facially] treat all health care providers who are subject to them the same and apply the same requirements to them.  Plaintiffs, therefore, can only argue the [CON] provisions have a discriminatory effect on a particular group." *Truesdell*, 2020 WL 5111206, at *8.  Further, the parties agree rational basis review applies because the law does not affect a suspect class.  Like substantive due process, the classification here "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller*, 509 U.S. at 319-20.  Courts recognize that particularly in areas of "economic or social legislation," such as when "[d]efining the class of persons subject to a regulatory requirement," the legislature at times "must necessarily engage in a process of line-drawing," which "inevitably requires that some persons . . . be placed on different sides of the line . . . ." *Beach Commc'ns, Inc.*, 508 U.S. at 314 (internal citations omitted).  A law will fail rational basis review if "the varying treatment of different groups of persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97 (1979).

Plaintiffs claim the formula distinguishing between existing HHAs and new HHAs is irrational, specifically because it requires new HHAs to show 250 patients in need but only requires existing agencies to show 125.  (*See* Pls.' Mot. Summ. J. 5-6).  Initially, the Court is disinclined to "pick apart the [CON] statute specialty by specialty or to unravel a complex medical regulatory scheme strand by strand." *Colon Health Ctrs. of Am.*, 733 F.3d at 548; *see also Truesdell*, 2020 WL 5111206, at *7 ("This Court takes the same approach and construes the legislative objective outlined in the statute above as applying to the CON process as a whole . . . .").  Further, Defendants and KHA have plausibly shown that requiring new HHAs show a need of 250 ensures sufficient patient volume, as 150 was the usual break-even point for HHAs.  (Sullivan Dep. 68:7-69:4).

20

Defendants and KHA reasonably maintain that a lower number is required for expansion than establishment because overhead costs are lower when an agency expands, as expansion does not entail starting a parent or subunit agency.  (Defs.' Mot. Summ. J. 23).  As addressed above, an agency's existing patient volume is rationally related to the interests of cost-efficiency, quality, and access, and therefore, it is logical to distinguish between expansion and establishment based on patient volume.

Plaintiffs then claim the formula for determining need is protectionist as-applied because there have been no CONs granted to new HHAs in the past twenty years.  (*See* Pls.' Resp. Defs.' Mot. Summ. J. 11).  Plaintiffs cite to *Bruner v. Zawacki*, No. 3:12-57-DCR, 2013 WL 2903241 (E.D. Ky. June 13, 2013), where the district court enjoined a CON statute applied to moving companies where the defendants "admitted that they know of no instance where, upon a protest by an existing moving company, a new applicant has been granted a certificate."  *Id.* at *3.  Plaintiffs claim the CON laws are invalid under *Craigmiles*, where the court struck down a law requiring casket sellers to be licensed funeral directors as impermissibly protectionist.  (Defs.' Mot. Summ. J. 23-24 (citing *Craigmiles*, 312 F.3d at 229)).

Between 2000 to 2020, of the ninety-five HHA CON applications considered, fifty-three were approved.  (Pls.' Mot. Summ. J. Ex. 10, at 2, DN 79-15).  Thirty-eight of those fifty-three were from existing HHAs that expanded, and thus were ostensibly approved based upon the lesser showing of need to expand rather than establish an agency.  (Pls.' Mot. Summ. J. 11).  In truth, the number of expansions is probably greater because, under Kentucky law, when an existing agency expands to a noncontiguous county it is considered a new agency.  (Pls.' Mot. Summ. J. 11).  Plaintiffs candidly acknowledge that at least six entirely new agencies were approved in Kentucky during this period, not zero.  (Pls.' Mot. Summ. J. 11).  Furthermore, Defendants and KHA note

that ten applications to expand or establish a HHA were approved despite opposition. (Defs.' Mot. Summ. J. Ex. 2, at 9).

Accordingly, unlike *Bruner* where the Court held "to the extent that the protest and hearing procedure prevents excess entry into the moving business, it does so *solely* by protecting existing moving companies[,]" Kentucky's CON formula has not operated *solely* to protect existing HHAs. *Bruner v. Zawacki*, 997 F. Supp. 2d 691, 700 (E.D. Ky. 2014). Similarly, "this case is quite different from [*Craigmiles*] where there was another alternative reason which was both clear and improper." *Norton Constr. Co. v. U.S. Army Corps of Eng'rs*, No. 1:03-CV-02257, 2007 WL 1431907, at *7 (N.D. Ohio May 14, 2007), *aff'd*, 280 F. App'x 490 (6th Cir. 2008) (citations omitted); *see also Craigmiles*, 312 F.3d at 225 (holding the law must "come close to striking us with 'the force of a five-week-old, unrefrigerated dead fish,' a level of pungence almost required to invalidate a statute under rational basis review." (internal citation omitted)). Importantly, the courts in *Craigmiles* and *Bruner* only held the respective laws unconstitutionally protectionist *after* finding there was no rational basis that supported the distinction.[13] *Craigmiles*, 312 F.3d at 228 ("*Finding no rational relationship to any of the articulated purposes of the state*, we are left with

---

[13] Again, Plaintiffs assert Nepali-speaking patients are not receiving greater access to care because the CON formula prevents a HHA like Grace from opening. Defendants and KHA point out that home health services are prescribed by a doctor and that the services Plaintiffs focused on in their Complaint, like transportation and food preparation, are considered incidental to home health services, but are not services themselves. (Defs.' Mot. Summ. J. 6-7). In fact, Plaintiffs already had a certificate that would have allowed them to provide incidental services. (Defs.' Mot. Summ. J. 7-8; Defs.' & Intervenor Def.'s Joint Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. Ex. 7, DN 84-9). As to prescribed services, Plaintiffs admit they do not know of Nepali speakers in the Louisville Metro area that were not receiving services. (Pls.' Resp. Defs.' Mot. Summ. J. 14). A classification does not fail rational-basis review "simply because [it] 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (citation omitted). Furthermore, Defendants and KHA plausibly posit that permitting a special HHA for each ethnic group could fractionalize and destabilize the market.

the more obvious illegitimate purpose to which licensure provision is very well tailored." (emphasis added)); *Bruner*, 997 F. Supp. 2d at 700-01.

Finally, Plaintiffs claim the exceptions in the CON laws irrationally exempt similarly situated medical providers. (Pls.' Mot. Summ. J. 22-23). "[T]he fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). The state need not "choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge*, 397 U.S. at 487 (citation omitted). But the Court does "insist on knowing the relation between the classification adopted and the object to be attained. The search for the link between classification and objective gives substance to the Equal Protection Clause . . . ." *Romer v. Evans*, 517 U.S. 620, 632 (1996). The exemptions here must at a minimum be reasonable. Under the CON program, continuing care retirement communities ("CCRC") and physician's offices are exempt from CON requirements. KRS 216B.020(1), (2)(a). Plaintiffs argue that CCRCs are similar to HHAs because of the small patient populations served and that presumably both CCRCs and physician offices would benefit from patient-volume and economies of scale like HHAs. (Pls.' Mot. Summ. J. 22-23).

Regarding physician's offices, Defendants and KHA explain that due to the historic and current shortage of physicians in Kentucky and the different types of services provided, proliferation of physicians' offices has never been a concern. (Defs.' Mot. Summ. J. 24-25). Plaintiffs note this contradicts Defendants' and KHA's previous argument that "[a]llowing HHAs to proliferate without regard to need would also exacerbate Kentucky's *shortage* of home health workers." (Pls.' Resp. Defs.' Mot. Summ. J. 24 (citing Defs.' Mot. Summ. J. 21 (emphasis in original)). This exemption, however, is plausibly based on a distinction between proliferation—the destabilizing growth in the number of providers—and expanded access to care—which

23

includes cost-efficient and quality services.   As Plaintiffs note, physician offices are more expensive to operate, and HHAs do not require the same level of expertise as other healthcare services.   (Pls.' Mot. Summ. J. 20-21, 23).   Accordingly, the General Assembly could have rationally believed it was less likely that physician offices would undesirably proliferate across the Commonwealth in the same way that HHAs might.

As to CCRCs, these entities are prohibited from providing home health services to patients other than their own, making the exception relatively small.   (Sullivan Dep. 215:3-23).   Also, CCRCs are not eligible to participate in the Kentucky's Medicaid program, which means the Commonwealth does not pay for the services like it does for HHAs.   (Sullivan Dep. 257:16-21). Importantly, Defendants and KHA maintain the exemption is meant to guarantee continuity of care by the same staff throughout convalescence, rather than have the patient passed off to another HHA.   (Defs.' Mot. Summ. J. 24).   Plaintiffs reply that this proves CON laws are meant to limit access, as the exemption was intended to avoid barring CCRCs from the market.   (Pls.' Resp. Defs.' Mot. Summ. J. 24).   But all this shows is that CON laws might have the effect of limiting access by *particular* staff.   In the CCRC context, therefore, the interest in continuity of care *by the same staff* was reasonably addressed through an exemption.   This is different from the continuity of care at issue for HHAs, where the concern is a gap in the middle of treatment.

"True, even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation."   *Heller*, 509 U.S. at 321.   But "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends."   *Id.*   "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." *McGowan v. Maryland*, 366 U.S. 420, 425 (1961).   "Discrimination that can *only* be viewed as

arbitrary and irrational *will* violate the Equal Protection Clause." *Hadix*, 230 F.3d at 843 (citing *Vance*, 440 U.S. at 93).

Plaintiffs have not shown that the CON laws irrationally discriminate against agencies in the HHA context, and therefore, have failed to show a violation of the Equal Protection Clause.

### C.   **Conclusion**

As the Fourth Circuit recognized, "[c]ertificate-of-need regimes—in place in many states across this country—are designed in the most general sense to prevent overinvestment in and maldistribution of health care facilities." *Colon Health Ctrs. of Am.*, 813 F.3d at 155. These laws have been consistently upheld against Fourteenth Amendment attacks. *See Birchansky*, 955 F.3d at 758-59; *Colon Health Ctrs. of Am.*, 813 F.3d at 155; *Truesdell*, 2020 WL 5111206, at *6-8. To the extent Plaintiffs have submitted evidence that the CON laws are ineffective, a sister court recognized:

> Alas, what the Court may or may not think about the propriety of, or need for, a [regulation] is really of no moment. Legislative bodies "are accorded wide latitude in the regulation of their local economies under their police powers," they "may implement their program step by step in . . . economic areas, adopting regulations that only partially ameliorate a perceived evil," and "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." As previously noted, "even foolish and misdirected provisions are generally valid" under the rational basis standard of review, and "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."

*Bokhari*, 2012 WL 1165907, at *7 (internal citations omitted) (citation omitted). Accordingly, Defendants' and KHA's motion for summary judgment is granted and Plaintiffs' motion is denied.

## IV.   CONCLUSION

For the reasons discussed above, **IT IS HEREBY ORDERED:**

1.      Defendants' and Intervenor Defendant's Motion for Summary Judgment (DN 84), Plaintiffs' Motion to Withdraw their Motion to Strike (DN 89), and Plaintiffs' Motion to Strike and Substitute (DN 90) are **GRANTED**.   Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

2.      Defendants' and Intervenor Defendant's Motion for Reconsideration (DN 68), Plaintiffs' Motion for Summary Judgment (DN 79), and Plaintiffs' Motion to Strike (DN 87) are **DENIED**.

3.      Defendants' and Intervenor Defendant's Motions in Limine (DN 93, 94) are **DENIED AS MOOT**.

4.      The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge

United States District Court

April 14, 2021

cc:      counsel of record